# STATE OF CONNECTICUT *v.* EZRA BENJAMIN
## (AC 24088)

Flynn, West and McDonald, Js.

Argued April 28—officially released December 14, 2004

*Adele V. Patterson,* assistant public defender, for the appellant (defendant).

*Mitchell S. Brody,* senior assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Cara F. Eschuk,* senior assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, Ezra Benjamin, appeals from the judgments of conviction as to two informations, which were consolidated for a jury trial. As to one information, involving the victim D,[1] the defendant was convicted of assault in the second degree in violation of General Statutes § 53a-60 (a) (1), unlawful restraint in the first degree in violation of General Statutes § 53a-95 and assault in the third degree in violation of General Statutes § 53a-61 (a) (1).[2] As to the other information, involving the victim C, the defendant was convicted of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), assault in the second degree in violation of § 53a-60 (a) (1), unlawful restraint in the first degree in violation of § 53a-95 and assault in the third degree in violation of § 53a-61 (a) (1). On appeal, the defendant claims that (1) his convic-

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom their identity may be ascertained. See General Statutes § 54-86e.

[2] The defendant was acquitted of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1).

tion in each information of assault in the second degree and assault in the third degree violated the prohibition against double jeopardy, (2) the court's instructions to the jury improperly reduced the state's burden of proof as to the element of restraint necessary to prove a violation of unlawful restraint in the first degree and (3) he was denied his right to due process because of prosecutorial misconduct. We agree with the defendant's first claim, but disagree with his remaining claims.

The jury reasonably could have found the following facts. At approximately 9 p.m. on the evening of September 26, 2001, the victim, D, who worked as a prostitute, was walking on Cherry Street in Waterbury and was approached by the defendant, who was driving his maroon Mitsubishi convertible. The defendant asked D if she wanted a ride home and offered her $50. D agreed and entered the defendant's vehicle. The defendant then drove to Fulton Park in Waterbury. Upon arriving at Fulton Park, the defendant exited the vehicle. D, however, refused to exit until she received the $50. The defendant then showed D some papers in his pocket that appeared to be money and D exited the vehicle. At that time, the defendant seized D by the neck with his forearm and dragged her to a tree in the park. There, the defendant began to beat D. The defendant struck D in the head with a rock, causing a laceration, and also struck D in the head and eye. D attempted to fight back by scratching the defendant, but lost consciousness as the defendant choked her. Upon regaining consciousness, D was partially unclothed. D was wearing only a bloody white T-shirt and one sneaker. Her pants and bra had been removed during the struggle.

After seeing that the defendant had left the scene, D asked people nearby to take her to St. Mary's Hospital, where she was examined. When D went to the emergency room, her head, eye and throat were in pain, and

she was bleeding from her head. D suffered lacerations to her scalp and back, and facial trauma, and showed signs of life threatening strangulation.

During the same evening of September 26, 2001, the other victim, C, was working as a prostitute in the vicinity of Walnut Street and Orange Street in Waterbury. That night, C entered a vehicle operated by the defendant, a maroon Mitsubishi convertible with temporary license plates. After C entered the vehicle, the defendant drove around the block and parked in a nearby lot. Once at the lot, the defendant and C exited the vehicle. While outside the vehicle, the defendant showed C $50 and then put the money back into his pocket. At that point, C began to walk away. The defendant seized C from behind and choked her with his forearm, which caused her to lose consciousness.

When C regained consciousness, her pants were pulled down, and the defendant was sexually assaulting her. The defendant still had his hand on C's throat. The defendant then asked C if she wanted to die. C began to cry, and the defendant removed his hand from her throat. C then began to scream and attempted to get away from the defendant, but lost consciousness once more when the defendant strangled her again. When C regained consciousness, the defendant had left. C then began to scream for help. She was found, partially undressed, by a friend. C's pants, underwear and jacket had been removed during the attack. C was taken to St. Mary's Hospital, where she was examined. Upon arriving at the hospital, C's eyes and nose were bloody, and there were marks on her neck, hands and legs. C was found to have abrasions to her face, trunk, chest area, back and extremities, and a bloody nose. She also had injuries to her eyes and contusions around her neck. As a result of being choked to unconsciousness, a life threatening condition, C displayed conjunctival hemorrhaging.

Both C and D were questioned by the police, and they provided a description of the assailant and the vehicle that he was driving. Officers then went to the area of Fulton Park where D was attacked. While at the scene of the attack, the police discovered, among other items, a remote keyless entry device for an automobile. Upon locating a maroon Mitsubishi convertible near the place where C was assaulted, the police used the entry device to unlock the vehicle's doors. The police then ascertained that the defendant was the owner of the vehicle. That night, the police found the defendant hiding naked in a cabinet in a bathroom closet in his apartment.

I

The defendant claims that his conviction with respect to each victim of assault in the second degree in violation of § 53a-60 (a) (1)[3] and assault in the third degree in violation of § 53a-61 (a) (1)[4] violated the prohibition against double jeopardy under both the federal and state constitutions.[5] We agree.

The defendant did not preserve his claim at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[6] "A defendant may

---

[3] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (1) [w]ith intent to cause serious physical injury to another person, he causes such injury to such person . . . ."

[4] General Statutes § 53a-61 (a) provides in relevant part: "A person is guilty of assault in the third degree when . . . (1) [w]ith intent to cause physical injury to another person, he causes such injury to such person . . . ."

[5] "The Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy." *State* v. *Ferguson*, 260 Conn. 339, 360, 796 A.2d 1118 (2002). Because our state constitution does not provide greater protection than the federal constitution, we limit our analysis to that of the federal constitution.

[6] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right;

obtain review of a double jeopardy claim, even if it is unpreserved, if he has received two punishments for two crimes, which he claims were one crime, arising from the same transaction and prosecuted at one trial . . . even if the sentence for one crime was concurrent with the sentence for the second crime. . . . Because the claim presents an issue of law, our review is plenary." (Citations omitted.) *State* v. *Crudup*, 81 Conn. App. 248, 252, 838 A.2d 1053, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004).

"Double jeopardy prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense. . . . The double jeopardy analysis in the context of a single trial is a two part process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *Scott*, 270 Conn. 92, 98, 851 A.2d 291 (2004). "In conducting this inquiry, we look only to relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Palmer*, 206 Conn. 40, 52, 536 A.2d 936 (1988).

The defendant was charged in each information with assault in the second degree in that he intentionally caused serious physical injury to each victim by choking her to the point of unconsciousness. The defendant was also charged in each information with assault in the third degree in that he intentionally caused unspecified physical injury to each victim. Each information stated that the assault in the second degree occurred at the

(3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

same time and same location as the assault in the third degree. As charged in the informations, each count of assault in the third degree was a lesser offense included within the counts of assault in the second degree. See *State* v. *Abdalaziz*, 45 Conn. App. 591, 597, 696 A.2d 1310 (1997), aff'd, 248 Conn. 430, 729 A.2d 725 (1999). Our courts repeatedly have held that lesser included offenses are the same offenses for double jeopardy purposes. See *State* v. *Goldson*, 178 Conn. 422, 425, 423 A.2d 114 (1979); *State* v. *Flynn*, 14 Conn. App. 10, 18–19, 539 A.2d 1005, cert. denied, 488 U.S. 891, 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988).

The state argues that there was evidence from which the jury could have concluded that there were distinct offenses committed against each victim. "[D]ouble jeopardy prohibits multiple punishments for the same offense in the context of a single trial. Nonetheless, distinct repetitions of a prohibited act, *however closely they may follow each other* . . . may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]. . . . A different view would allow a person who has committed one . . . assault upon a victim to commit with impunity many other such acts during the same encounter. *State* v. *Frazier*, [185 Conn. 211, 229, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982)]; *State* v. *Cassidy*, 3 Conn. App. 374, 388, 489 A.2d 386 ([E]ach assault upon the victim involved a separate act of will on the part of the defendant and a separate indignity upon the vic-

tim. . . . [T]he legislative intention was that each assault should be deemed an additional offense. . . . To interpret the statute otherwise would be to strip it of all its sense. . . .)" (Emphasis in original; internal quotation marks omitted.) *State* v. *Scott,* supra, 270 Conn. 99–100.

The state cites evidence from which the jury could have found distinct and separate assaults involving both victims. The defendant choked D until she lost consciousness and also hit her repeatedly with a rock, leaving a scar. As to C, there was evidence from which the jury could have found that she was choked twice until she lost consciousness, once before she was sexually assaulted and once during that assault.

Even if the evidence presented would support findings of separate assaults, the court instructed the jury that it could find the defendant guilty of assault in the second degree if it found that he intentionally caused serious physical injury to each victim by choking each victim to the point of unconsciousness. The court instructed the jury that "serious physical injury" means "physical injury, which is any impairment of physical condition or pain causing serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ."

The court also instructed the jury that it could find the defendant guilty of assault in the third degree if it found that the defendant intended to cause physical injury to each victim and caused such injury. Although the court did not define the term "physical injury" with respect to the statute proscribing assault in the third degree, it had instructed the jury, during its charge on unlawful restraint in the first degree, that "physical injury" means "impairment of physical condition or pain."

As to the counts of assault in the third degree, the court did not limit the jury's consideration of physical injury to injuries other than those that resulted from choking each victim to the point of unconsciousness, which was the basis for the counts of assault in the second degree. This permitted the jury to find the defendant guilty of assault in the third degree on the basis of his having intentionally caused the victims physical injury while choking them. Accordingly, we conclude that the defendant's right to be free of double jeopardy was violated.

Having concluded that the defendant's conviction of assault in the second degree and assault in the third degree violated the prohibition against double jeopardy, we next must address the proper remedy. In *State* v. *Chicano*, 216 Conn. 699, 721–25, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), our Supreme Court held that when a defendant is convicted of both a greater and lesser offense arising out of the same transaction, the proper remedy is to combine the conviction of the lesser offense with the conviction of the greater offense and to vacate the sentence on the lesser offense. Accordingly, we remand these cases to the trial court with direction to combine the convictions of assault in the third degree with the convictions of assault in the second degree and to vacate the sentences for assault in the third degree.

## II

The defendant claims that the court's instructions to the jury improperly reduced the state's burden of proof on the element of restraint necessary to prove the charges of unlawful restraint in the first degree. Although we agree with the defendant that the court's instruction was improper, we conclude that it was harmless.

The defendant did not preserve his claim at trial and seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40, or the plain error doctrine. See Practice Book § 60-5.[7] Because the record before us is adequate and the defendant's claim is of constitutional magnitude alleging the violation of a fundamental right, we will review the defendant's claim under *Golding*.

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Davis*, 261 Conn. 553, 564, 804 A.2d 781 (2002).

In this case, the defendant was charged in each information with one count of unlawful restraint in the first degree in violation of § 53a-95. During its charge to the jury on those counts, the court, as requested by the state, instructed: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury. . . . 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences, or in a place to which he has been moved, without his consent. *As used herein, 'without consent' means, but it is not limited to, any means whatever.*" (Emphasis added.) It is the defendant's contention that the court's definition of

[7] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

"without consent" improperly instructed the jury as to its proper meaning.

Section 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury." Accordingly, in order for the jury to convict the defendant of unlawful restraint in the first degree as to each victim, the state was required to prove beyond a reasonable doubt that the defendant (1) restrained the victim and (2) that the restraint exposed the victim to a substantial risk of physical injury.

"Restrains," as used in § 53a-95 (a), "means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein 'without consent' means, but is not limited to, (A) deception and (B) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement." General Statutes § 53a-91 (1). Our Supreme Court has approved a trial court's charge to the jury that the "restraint" defined in § 53a-91 (1) must be without the victim's consent and that acquiescence obtained by fraud or deception is not deemed consent. *State* v. *Smith*, 198 Conn. 147, 152, 502 A.2d 874 (1985).

The instruction in this case omitted any reference to deception or other acts that could negate a victim's voluntary and willing consent to being moved or having her movements restricted. From the court's definition of lack of consent as "any means whatever," the jury

could believe that anything the defendant did to move or to restrict the victims' movements could support findings of lack of consent. We agree with the defendant that the "any means whatever" language contained in § 53a-91 (1) B was to protect young children and incompetent persons from being kidnapped when the victim agrees to go with the kidnapper because of promises of favors or gifts. A competent adult's actual consent to the restraint would negate lack of consent if not induced by deception, force, fear or shock; in other words, with no compulsion or deception. See D. Borden & L. Orland, 5 Connecticut Practice Series: Connecticut Criminal Jury Instructions (2d Ed. 1997) § 11.3, p. 572. The "any means whatever" language should not be given in an instruction when, as here, the victim is a competent adult.

Although we agree with the defendant that the court's instruction was improper, we nonetheless conclude that it was harmless. Our Supreme Court has held that an improper jury instruction, even as to an element of an offense, is harmless when a reviewing court can conclude beyond a reasonable doubt that the verdict would have been the same absent that error because the finding of guilt was supported by overwhelming evidence. See *State* v. *Montgomery*, 254 Conn. 694, 738, 759 A.2d 995 (2000); *State* v. *Tucker*, 226 Conn. 618, 624–25, 629 A.2d 1067 (1993).

Evidence of the victims' lack of consent to restraint was overwhelming and undisputed. The jury heard evidence that the defendant was not known to the victims, that the victims resisted being restrained by fighting back and attempting to escape from the defendant's grasp, and that the defendant strangled both victims until they lost consciousness. The police found evidence of drag marks in the area of Fulton Park where D was beaten and where C was discovered beaten, bloodied and unclothed after her encounter with the

defendant. The defendant did not dispute this evidence at trial, but instead argued that he was not the perpetrator of these crimes. See *State* v. *Tucker,* supra, 226 Conn. 625 n.8. We observe, as did the *Tucker* court, that these facts compel the conclusion, beyond a reasonable doubt, that in the absence of the erroneous jury instruction, the jury would have concluded that the victims did not consent to being restrained. Consequently, we conclude that the alleged violation was harmless for the purpose of *Golding*'s fourth prong.[8]

This claim therefore does not warrant plain error review. "Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Andresen,* 256 Conn. 313, 336, 773 A.2d 328 (2001). As we have concluded, the impropriety in the court's charge was harmless.

### III

The defendant claims that he was denied his right to a fair trial as a result of prosecutorial misconduct. We disagree.

We will review the defendant's claim under *State* v. *Stevenson,* 269 Conn. 563, 849 A.2d 626 (2004). Applying the standards set forth in *State* v. *Ancona,* 270 Conn. 568, 854 A.2d 718 (2004), *State* v. *Sinvil,* 270 Conn. 516, 522–25, 853 A.2d 105 (2004), *State* v. *Stevenson,* supra, 571–77, *State* v. *Thompson,* 266 Conn. 440, 457–61, 832 A.2d 626 (2003), and *State* v. *Williams,* 204 Conn. 523, 540, 529 A.2d 653 (1987), we conclude that even if the prosecutor's remarks were improper, the defendant was not deprived of a fair trial.

We begin our analysis by first determining whether the conduct of the prosecutor constituted misconduct.

---

[8] See footnote 6.

A

The defendant's claims of prosecutorial misconduct can be broken down into three general categories: (1) comments about the defendant's changed physical appearance; (2) comments about the credibility of the victims; and (3) comments about the evidence.

"While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Internal quotation marks omitted.) *State* v. *Sells*, 82 Conn. App. 332, 340, 844 A.2d 235, cert. denied, 270 Conn. 911, 853 A.2d 529 (2004). "[W]hen a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 400, 832 A.2d 14 (2003).

1

The defendant claims that two comments made by the prosecutor about how the defendant's physical appearance changed from the date of the assaults amounted to misconduct. He first claims that the prosecutor improperly stated: "Let's look at what is before you. What is before you is evidence of the defendant's identification by these witnesses shortly afterward. It's interesting, in my view, the defendant today, after the witnesses have testified, seems to have a much shorter haircut than he did during the trial. Look at him. Doesn't he look bald now? Did he look bald when the witnesses were here available to testify, to identify him?"

Both D and C had selected the defendant from a photographic array as their attacker shortly after the

attacks. During the trial, both were unable to identify the defendant as their attacker. D testified that although the defendant looked like her attacker, her attacker, unlike the defendant during the trial, had no hair and was "more muscular." The defendant was present during the trial, and it was not improper for the prosecutor to make such a comment.

It was also not improper for the prosecutor to comment that "[the defendant's] hair is very short at that point, less hair, less likelihood that anything is going to be left." There was testimony presented to the jury that D's attacker had no hair at the time of the assaults.

2

The defendant claims that several of the comments made by the prosecutor regarding the credibility of the victims were improper.[9] We disagree.

Initially, we recognize that "[p]rosecutors may not offer their opinions by vouching for the credibility or truthfulness of a witness." *State* v. *Dearborn*, 82 Conn. App. 734, 748, 846 A.2d 894, cert. denied, 270 Conn. 904, 853 A.2d 523 (2004). In this case, however, the prosecutor's comments were in response to the defendant's attempts during the course of the trial to impeach the credibility of the victims and did not constitute improper vouching.

---

[9] The prosecutor stated in relevant part: "I submit to you that [the defendant] may have selected his victims, both are prostitutes, the sort of women that, frankly, as some of you admitted during voir dire, are not the most credible of people.

\* \* \*

"It is irrelevant that [C], the poor woman, is a crack addict or was at that time a crack addict. . . . Perhaps it made [the victims] more vulnerable that they were prostitutes, perhaps it made them more vulnerable that they had ingested some sort of drugs, but it doesn't alter the fact that they were raped and beaten and assaulted, which shouldn't happen to anybody. . . . It doesn't matter that they were prostitutes. They were human beings, and the defendant chose not to treat them as such."

## 3

The defendant claims that several of the comments made by the prosecutor regarding the evidence were improper.[10] We agree.

A prosecutor is prohibited from commenting on facts that are not in evidence. There was no evidence before the jury that the lack of blood on the defendant was because he took "considerable care" during the assaults, nor was there any evidence as to the defendant's state of mind if and when he realized that his keychain was missing the remote keyless entry device. Accordingly, the comments were improper.

## 4

The defendant's final claim of misconduct by the prosecutor occurred during final summation to the jury when the prosecutor stated: "Ladies and gentlemen, I would ask you to consider what you do have in this case, not to be misled or put on a wild goose chase by the questions that [defense] counsel has raised. Think about them and ask whether each of those questions

---

[10] The defendant challenges the following statements by the prosecutor: "Good morning, ladies and gentlemen. You know, it's the little things that count. Can you imagine [the defendant's] reaction when he saw those keys, that bunch of keys which should have had, not only his ignition key, but also that keyless remote on it, and he tossed them down by his computer console and he realized there was no remote? It had been there for less than two weeks, a $150 gadget, which came with a beautiful new maroon convertible that he just acquired. But he didn't realize that that little thing might be what would lead to his undoing, because that's what happened."

"He did not want her to have any clothes on when he had sexually assaulted her in case something was left. . . . Maybe he removed his overgarments for that."

"Again, I remind you, my suggestion, and it is nothing more than a suggestion, that those clothes were removed from not only [C] . . . but also from [D] and, again, I suggest to you that that was in order to try and make sure that there was less chance that there would be anything caught up in clothes."

"Now, there wasn't much blood on [the defendant's] clothes, not as much as would be suggested by the amount that [D] bled. Again, I would suggest to you that that may indicate considerable care by him."

actually is something that you need to consider. I would ask you to accept that most of those questions are done for no reason other than to divert you from the issues at hand, which is that you have evidence that there was contact between [the defendant] and [the victims]. That contact corroborates the assaults that they told you were committed upon them and that there is over-whelming evidence that each of the charges the state has levied against [the defendant] is proven beyond a reasonable doubt." We do not find this comment to amount to misconduct. The prosecutor merely asked the jury to focus its attention on the evidence presented, not on the arguments from defense counsel that raised numerous questions about the collection and DNA analysis of the physical evidence.

## B

Having concluded that some of the prosecutor's comments were improper, we now turn to the question of whether the improper comments "so infect[ed] the trial with unfairness as to make the conviction a denial of due process . . . ." *State* v. *Stevenson*, supra, 269 Conn. 589. In doing so, we will consider the factors listed by our Supreme Court in *State* v. *Williams*, supra, 204 Conn. 540. In applying the *Williams* factors, we recognize that the defendant did not object to any of the comments made by the prosecutor, and this must enter into our assessment of each factor. See *State* v. *Stevenson*, supra, 591.

We agree with the state that the comments did not deprive the defendant of his due process right to a fair trial. Although the defendant did not invite the improper comments made by the prosecutor, the comments were not severe or excessive. Although the defendant failed to object to any of the comments, the court did instruct the jury that counsel's arguments were not evidence. See id., 597–98.

Finally, there was overwhelming evidence of the defendant's guilt. The jury heard testimony that, shortly after they were attacked, C and D picked a photograph of the defendant out of an array as being of their assailant. That photograph was introduced into evidence, and each victim testified that the photograph was a photograph of her attacker. The jury also heard the testimony of a friend of C, who testified that he observed C get into the defendant's vehicle shortly before she was attacked. Further, the police found the defendant's remote keyless entry device for his vehicle where D was attacked and, by using it, traced the device to the defendant's vehicle.

When the police went to the defendant's apartment to arrest him, they found him hiding naked in a cabinet in a closet. When searching the defendant's apartment, the police found the defendant's clothing, which was submitted for laboratory analysis and comparison with the DNA of the defendant, D and C. As a result, there was strong physical and forensic evidence that connected the defendant to the attacks. The jury heard the testimony of Michael S. Adamowicz, a criminalist with the state forensic science laboratory, who performed a DNA analysis of that clothing and other evidence, and gave the results of matching DNA in terms of population frequency. Adamowicz testified that scrapings underneath D's fingernails revealed cellular DNA[11] from both D and the defendant. A cellular DNA profile of a part of a semen stain on a pair of boxer shorts found at the defendant's apartment revealed that the defendant and C were contributors to the stain. A similar test performed on a bloodstain on the boxer shorts revealed

---

[11] See General Statutes § 54-86k; *State* v. *Whipper*, 258 Conn. 229, 238, 780 A.2d 53 (2001), overruled in part on other grounds, *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004); *State* v. *Pappas*, 256 Conn. 854, 867, 776 A.2d 1091 (2001); *State* v. *Sivri*, 231 Conn. 115, 155, 646 A.2d 169 (1994); *State* v. *Hammond*, 221 Conn. 264, 281–82, 604 A.2d 793 (1992).

that the stain came from the defendant and D. A blood-stain on a sweatshirt seized from the defendant's apartment came from D. The defendant and C were the contributors of a "reddish brown stain" on a T-shirt that was seized from the defendant's apartment. D could not be eliminated as a contributor to that stain. D's blood was also found on the inside passenger window of the defendant's vehicle.

We conclude, therefore, that the prosecutor's comments, although improper, did not deprive the defendant of the right to due process. See *State* v. *Stevenson*, supra, 269 Conn. 598.

The defendant also seeks review under the plain error doctrine. "It is . . . well established that plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Beverly*, 72 Conn. App. 91, 103, 805 A.2d 95, cert. denied, 262 Conn. 910, 810 A.2d 275 (2002). Due to the overwhelming evidence of his guilt, the defendant has failed to demonstrate that the prosecutor's comments were so harmful that a manifest injustice would occur if the judgments of conviction are not reversed.

The judgments are reversed in part and the cases are remanded with direction to combine the conviction of assault in the second degree with the conviction of assault in the third degree in each case and to vacate the sentences for assault in the third degree. The judgments are affirmed in all other respects.

In this opinion the other judges concurred.